UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

M.C., an infant by her                          *
father and natural guardian, JOHN               *
CATAPANO, and JOHN CATAPANO,                    *
Individually, and D.C.,                         *
an infant by her mother and natural             *
guardian, CHRISTINE CATAPANO and                *
CHRISTINE CATAPANO, Individually,               *
                                                *
        Plaintiffs,                             *
                                                *       Civil Action No. 13-30119-MGM
                v.                              *       [consolidated with Civil Action No.
                                                *       13-30108-MGM]
JIMINY PEAK MOUNTAIN RESORT, LLC                *
And WIEGAND SPORTS, LLC,                         *
                                                *
        Defendants.                             *


<u>MEMORANDUM AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT</u>

<u>AS TO THE CROSS-CLAIMS OF DEFENDANTS</u>

<u>JIMINY PEAK MOUNTAIN RESORT, LLC AND WIEGAND SPORTS, LLC</u>

(Dkt. Nos. 62 & 68)


August 30, 2016


MASTROIANNI, U.S.D.J.

I.      INTRODUCTION

        This case began as a lawsuit brought in the Eastern District of New York by the parents of

two minor children who sustained severe injuries in August of 2012 while riding an Alpine Coaster

("Coaster") manufactured and installed by Wiegand Sports, LLC ("Wiegand) and operated by

defendant Jiminy Peak Mountain Resort, LLC ("Jiminy"). The parents asserted various claims

including negligence claims against both Jiminy and Wiegand and products liability claims against

Wiegand. The case was transferred to this court by the agreement of the parties. Jiminy and Wiegand

filed cross-claims against each other, asserting each entity was obligated to indemnify the other pursuant to language in the parties' 2007 contract for the purchase and installation of the Coaster and the common law doctrines of contribution and indemnification. Jiminy and Wiegand resolved the claims made by the parents through a single settlement which did not tie the payments to the merits of any particular claims. The parties subsequently filed a stipulation of dismissal with respect to most claims, leaving only the cross-claims between Jiminy and Wiegand.[1] Before the court are cross-motions for summary judgment as to the cross-claims.[2] Each party argues the other has an obligation to indemnify it and pay its defense costs in connection with this suit.

## II.   JURISDICTION

Federal courts have jurisdiction over suits brought pursuant to state law where there is complete diversity of citizenship between the adversaries and the amount in controversy exceeds a threshold amount of $75,000. 28 U.S.C. § 1332; *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 513 (2006). Where there is a basis for federal jurisdiction over the original claims in a suit, this court may exercise supplemental jurisdiction as to related claims that "form part of the same case or controversy," including cross-claims asserted pursuant to Rule 13 of the Federal Rules of Civil Procedure. 28 U.S.C. § 1367. Plaintiffs, all New York residents, sought damages in excess of the statutory amount from Jiminy, a limited liability company organized in Massachusetts, and Wiegand, a limited liability company organized in Utah, neither of whom have members who reside in New York,[3] thereby establishing federal jurisdiction pursuant to 28 U.S.C. § 1332. As the dispute between Jiminy and Wiegand arises from their respective obligations to compensate each other for the costs

---

[1] Jiminy had also asserted claims against the parents, but those claims were also dismissed by stipulation.
[2] In a separate action, Civ. 14-cv-40115-MGM, Jiminy unsuccessfully asked this court to compel Wiegand's insurer to pay the costs of its defense in this action.
[3] The members of Jiminy are two other Massachusetts limited liability companies, the members of whom are Massachusetts residents. (14-cv-40115, Dkt. No. 55.) Wiegand's sole member is a privately held German company, whose members reside in Germany. (14-cv-40115, Dkt. No. 56.)

incurred defending the underlying suit, this court exercises supplemental jurisdiction over their

cross-claims pursuant to 28 U.S.C. § 1367.

### III.   SUMMARY JUDGMENT STANDARD

At the summary judgment stage, the court must view the facts in the light most favorable to

the non-moving party "and draw all reasonable inferences in its favor." *CNE Direct, Inc. v. Blackberry*

*Corp.*, 821 F.3d 146, 148 (1st Cir. 2016). "Summary judgment is permissible only when examination

of the record in that light reveals 'no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law.'" *Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849, 853 (1st Cir. 2016)

(quoting Fed. R. Civ. P. 56(a)). "'A dispute is genuine if the evidence about the fact is such that a

reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it

has the potential of determining the outcome of the litigation.'" *Patco Const. Co. v. People's United*

*Bank,* 684 F.3d 197, 206–07 (1st Cir. 2012) (quoting *Rodriguez-Rivera v. Federico Trilla Reg'l Hosp. of*

*Carolina*, 532 F.3d 28, 30 (1st Cir. 2008)). "Cross-motions for summary judgment require the district

court to 'consider each motion separately, drawing all inferences in favor of each non-moving party

in turn.'" *AJC Int'l, Inc. v. Triple-S Propiedad*, 790 F.3d 1, 3 (1st Cir. 2015) (quoting *D & H Therapy*

*Assocs., LLC v. Bos. Mut. Life Ins. Co.*, 640 F.3d 27, 34 (1st Cir. 2011)).

### IV.   MATERIAL FACTS

A.  The Parties' Contract

In December 2006, Jiminy and Wiegand entered into a Consulting, Purchase, Delivery,

Assembly, and Inspection Contraction ("Contract"). (Dkt. No. 70-1, Wiegand's Statement of

Material Facts, Ex. A, Contract.) The Contract provided for Jiminy's purchase of the Coaster and

Wiegand's installation of the Coaster at Jiminy's resort in Massachusetts. The Contract is to be

interpreted in accordance with Massachusetts law. (*Id.* at §18.) Under the heading "Indemnification," the Contract provides:

> [I]n the event of a product liability suit against [Weigand], [Weigand] shall, at its own expense, defend any suit or proceeding brought against [Jiminy] and shall fully protect and indemnify [Jiminy] against any and all losses, liability, cost, recovery, or other expense in or resulting from such . . . suit (provided, however, [Jiminy] has fully performed all ongoing maintenance obligations).

> (*Id.* at § 12.A.(1).)

> The following paragraph provides:

> [Jiminy] agrees to protect, indemnify, defend and hold [Weigand] harmless from and against any and all losses of [Weigand] arising out of or sustained in each case, directly or indirectly, from any breach of representation, covenant of [Jiminy] made herein or any default by [Jiminy] hereunder, including without limitation, from defective/bad maintenance and/or operation of [the Coaster] caused by [Jiminy's] gross negligence or willful misconduct, (except to the extent such maintenance and/or operation was in conformity with Wiegand's operation and maintenance specifications or recommendations), or non-compliance with applicable law.

> (*Id.* at § 12.A.(2).)

The final paragraph of § 12 limits the liability of Wiegand to an amount equal to the price Jiminy paid for the Coaster plus certain other expenses set out in the contract. The amounts to be paid by Jiminy are not similarly limited. In a separate section, the Contract further provides that "[Jiminy] shall ensure that only trained personnel will operate [the Coaster] in accordance with the design specification and written operating and maintenance instructions provided by [Wiegand]" and that Jiminy "shall take all necessary preventative measures in order to ensure rider safety." (*Id.* at § 8(i).) The Contract further provides:

> Any additional liability for damages beyond that provided for in the above-stated forms is excluded, irrespective of the nature of the legal claim. This applies in particular to personal injuries that may occur during the use of [Wiegand's] sports and leisure installations. [Jiminy] agrees to defend against such claims by obtaining adequate liability insurance.

> (*Id.* at Addendum B.)

4

B.  <u>The Coaster</u>

The Coaster consists of plastic sleds with wheels mounted to a tubular steel track configured so that the sleds are pulled uphill before being allowed to descend quickly. (Dkt. No. 75, Jiminy's Resp. to Wiegand's 56.1 Statement of Undisputed Facts, ¶ 3.) Each sled can accommodate up to two riders. (*Id.*) The larger rider sits in the back and is the sled operator, pushing handles on either side of the sled to release the brakes to allow the sled to accelerate down the track. (*Id.*) When the handles are released, the brakes engage and the sled does not descend the track. (*Id.*) Sleds have two seatbelts, a lap belt for the front rider and both a lap belt and shoulder harness for the rear rider. (*Id.*) Since at least the summer prior to the accident, Jiminy had known that some sled operators were putting their shoulder harnesses behind their shoulders in a manner that defeated the restraint system. (*Id.* at ¶ 16.) Jiminy had trained ride operators to watch for riders defeating the seatbelt restraint system in this manner. (*Id.*)

Ride attendants are stationed in two locations at the bottom of the ride: at the Bottom Station, near where the ride begins, and the adjacent Brake Station, near the end of the ride. (*Id.* at ¶ 4.) There is also a Top Station, at the top of the ride, where a ride attendant is stationed. (*Id.*) The attendant stationed at the top is able to observe riders as they enter the downhill portion and is supposed to monitor riders' compliance with safety rules. (*Id.* at ¶¶ 5, 19.) Riders caught disobeying safety rules are to be banned from riding the Coaster. (*Id.* at ¶ 20.) Four surveillance cameras are placed along the track and the surveillance feed from these cameras is displayed at the Bottom Station. (*Id.* at ¶ 6.)

C.  <u>The Accident</u>

On or about August 12, 2012, M.C. took four rides on the Coaster. (*Id.* at ¶ 17.) During each ride, M.C. sat in the rear and was the sled operator. (*Id.*) Each time M.C. entered the ride, she

was given instructions about the proper use of the seatbelts. (*Id.* at ¶ 14.) Each time she rode, M.C. defeated the seatbelt restraint system by putting the shoulder harness behind her shoulder. (*Id.* at ¶ 15.) Placing the shoulder harness behind her shoulder allowed M.C. to push the brake handles all the way forward, fully releasing the brakes. (*Id.* at ¶ 17.) With the shoulder restraint properly placed, M.C. was only able to push the brake handles about halfway forward. (*Id.*) Plaintiffs allegd that during M.C.'s fourth ride, while she was riding with her younger sister D.C., both girls were partially ejected from the sled and suffered severe injuries. (Complaint, ¶ 64, Dkt. No. 1.)

 

     D.  <u>This Action</u>

     In April of 2013 the plaintiffs filed suit against Wiegand and Jiminy. (Dkt. No. 75, Jiminy's Resp. to Wiegand's 56.1 Statement of Undisputed Facts ¶ 35.) The plaintiffs asserted product liability claims against Wiegand and negligence claims against Jiminy. (*Id.*) Jiminy and Wiegand asserted cross-claims against each other for contribution, contractual indemnification, and common law indemnification. (*Id.* at 37-38.) Jiminy also asserted a claim of breach of contract against Wiegand. (*Id.* at 38.) Shortly before the end of discovery, plaintiffs obtained this court's approval of a settlement. (Dkt. Nos. 56 and 57.) At the hearing in this motion, Jiminy and Wiegand informed the court they had evenly split the amount of the settlement in order to facilitate a resolution for the plaintiffs in advance of the resolution of their cross-claims.

     After settling with the plaintiffs, Jiminy and Wiegand filed cross-motions for summary judgment. The exact cause or causes of the injuries sustained by M.C. and D.C. have not been determined. However, Wiegand and Jiminy each argue the ultimate question of causation need not be resolved for the court to determine that the Contract requires the other party to indemnify it and pay its defense costs. Specifically, Jiminy asserts the causation

dispute is not material as to its claims against Wiegand. Under the Contract, Jiminy argues, Wiegand is required to pay Jiminy's defense costs and to indemnify Jiminy in any suit in which a product liability claim is asserted against Wiegand, regardless of whether a product defect was, in fact, a cause of any injuries. Wiegand, in turn, asserts the dispute as to causation is not material to its claims against Jiminy because the Contract does not condition Jiminy's obligation to indemnify Wiegand on a determination that plaintiffs' injuries were caused by Jiminy's conduct. Instead, Wiegand argues, the Contract requires only a showing that Wiegand's own losses, as established by the settlement, arise from a breach or default by Jiminy including through defective or bad operation caused by gross negligence or willful misconduct.

While the parties have focused their arguments on their contractual claims, Jiminy has also asserted that it is entitled to summary judgement on its common law indemnification and contribution claims. Jiminy has not, however, supported this assertion with any argument. In response, Wiegand has asserted summary judgment should not be granted in Jiminy's favor on its common law indemnification and contribution claims because Jiminy was itself at fault. In the absence of any argument from Jiminy as to the applicability of a common law basis for its claims, the court denies that part of Jiminy's motion asserting such a claim. Though Wiegand also asserts in its crossclaims that it is entitled to indemnification and defense costs under the common law of indemnification and contribution, Wiegand has not sought summary judgment on any common law claims.

## V.   DISCUSSION

A.   Obligations Under the Contract

Under Massachusetts law, "[t]he meaning of an unambiguous contract term is a question of law, while the meaning of an ambiguous contract term is a question of fact." *Farmers Ins. Exch. v. RNK, Inc.*, 632 F.3d 777, 783 (1st Cir. 2011) (applying Massachusetts law). Summary judgment is thus only appropriate if the court determines that either the text of the contract is not ambiguous or if the contractual language is ambiguous, but the undisputed evidence presented regarding the parties' intended meaning is "so one-sided that no reasonable person could decide to the contrary." *Id.* at 78. Indemnity provisions are interpreted in the same manner as "any ordinary contract." *Speers v. H.P. Hood, Inc.*, 495 N.E.2d 880, 881 (Mass. App. Ct. 1986).

In order to determine whether a contract is ambiguous, "the court must first examine the language of the contract by itself, independent of extrinsic evidence concerning the drafting history or the intention of the parties." *Bank v. Thermo Elemental Inc.*, 888 N.E.2d 897, 907 (Mass. 2008). "Ambiguity is not created merely because the litigants disagree about the meaning of a contract." *Nicolaci v. Anapol*, 387 F.3d 21, 26 (1st Cir. 2004). An agreement is only ambiguous if there are terms in the contract which are "inconsistent on their face" or where "the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken." *Lohnes v. Level 3 Commc'ns, Inc.*, 272 F.3d 49, 53 (1st Cir. 2001). When deciding whether a contract is ambiguous, the court must read the contract as a whole, without reading individual words or clauses in isolation. *Nicolaci v. Anapol*, 387 F.3d at 26.

Wiegand's obligations to defend and indemnify Jiminy are set forth in § 12.A.(1) of the contract; Jiminy's obligations to defend and indemnify Wiegand are set forth in § 12.A.(2). Though both sections must be read in context with each other and the Contract as a whole, the court turns first to § 12.A.(1). The language of § 12.A.(1) is clear and does not contain any internal inconsistencies. Omitting the portions not relevant in this case, the section can be paraphrased as providing that if a product liability suit is filed against Wiegand, Wiegand must pay to defend any

suit or proceeding brought against Jiminy. The language of the Contract does not mention causation or otherwise limit this obligation. In addition, Wiegand must fully protect and indemnify Jiminy against any and all losses resulting from the suit, as long as Jiminy had fully performed its maintenance obligations. The trigger for Wiegand's obligation to provide a defense to Jiminy is simply the filing of a lawsuit that includes at least one product liability claim against Wiegand.[4]

Obligations similar to those imposed on Wiegand are imposed on Jiminy in § 12.A.(2), but different language is used to describe the duties imposed on Jiminy and the events triggering those duties. Rather than separately address the duty to defend and the duty to indemnify, as was done in § 12.A.(1), the language in § 12.A.(2) creates a single obligation to "indemnify, defend and hold [Wiegand] harmless from and against any and all losses of [Wiegand] arising out of or sustained, in each case, directly or indirectly, from any breach of representation, covenant of [Jiminy] made herein or any default by [Jiminy] hereunder." Those events include Jiminy breaching or defaulting on promises set forth elsewhere in the Contract. Wiegand asserts Jiminy breached its obligations in several respects including by failing to "take all necessary preventative measures to ensure rider safety" as required by § 8(i), by acting with gross negligence or willful indifference to cause defective maintenance or operation of the Coaster, or by failing to apply with applicable law. Under § 12.A.(2) any singular triggering event will be sufficient and gross negligence or willful misconduct is not necessary if Jiminy breaches a representation or covenant under the Contract.

With respect to the obligations imposed by § 12.A.(1), Wiegand argues, when the Contract is read in its entirety, the clause becomes ambiguous because its language conflicts with the parties' intention, made clear elsewhere in the Contract. Wiegand asserts other sections of the Contract

---

[4] At the hearing on the cross-motions, counsel for Wiegand suggested that this paragraph contained a scrivener's error and that one instance of the word "SELLER" should have read "BUYER." This alteration would have changed the trigger for Wiegand's duty to defend from the filing of a product liability suit against Wiegand to one against Jiminy. Wiegand has offered no evidence to support such a theory and any evidence it did offer would be extrinsic and only relevant to resolving an ambiguity that does not exist on the face of the contract. *See Bank v. Thermo Elemental Inc.*, 888 N.E.2d at 907.

demonstrate the parties did not intend to impose on Wiegand a duty to defend and indemnify Jiminy in situations in which Jiminy was at fault, even if a product liability claim was asserted against Wiegand. Specifically, Wiegand points to § 8(i) of the Contract, which imposes on Jiminy obligations to take certain steps to ensure that the Coaster is operated safely and language in Addendum B to the Contract requiring Jiminy to obtain "adequate liability insurance" to defend against personal injuries that may occur in connection with use of the Coaster. While these other provisions certainly demonstrate the parties did not intend for § 12.A.(1) to fully describe the nature of the parties' obligations, they to do not conflict with § 12.A.(1) or render it ambiguous. At most these provisions, together with § 12.A.(2), suggest a lack of broad assessment of the potential litigation risks when drafting the contract.

Throughout the Contract concerns about litigation on product liability grounds are treated separately from concerns about litigation on negligence/negligent operation grounds, seemingly without expectation that a single suit could involve both types of claims. The very asymmetry of § 12.A.(1) and § 12.A.(2) reinforces this point. One set of criteria is used for triggering obligations related to personal injuries arising from a defective product and a different set of criteria are used for triggering opposite obligations related to personal injuries arising from defective operation and maintenance of the product. Neither set of criteria acknowledge the possibility of other claims, setting up a situation where both obligations could arise in the same litigation. While such a situation may create results one or both parties failed to anticipate, and may well regret, the situation does not render ambiguous the language driving those results. Sophisticated parties are free to enter into fully-informed contracts, but when they do so, they must live with the terms even when those terms end up proving detrimental for them.

B.  <u>Events Triggering Contract Obligations</u>

Having interpreted the contract as unambiguously imposing on the parties obligations to one another triggered by certain events, the court now considers whether those obligations have been triggered in this case or whether there are factual disputes which must be resolved before such a determination can be made.  Turning first to Wiegand's obligations to Jiminy, the court concludes, as a matter of law, that when plaintiffs filed their suits and asserted product liability claims against the manufacturer, Wiegand became obligated to pay Jiminy's defense costs related to the suit. Additionally, since the record does not contain any evidence suggesting Jiminy failed to properly maintain the Coaster, Wiegand is also obligated to indemnify Jiminy for its losses resulting from this suit. Under the Contract, these obligations are triggered by the filing of the suit, even though the record contains insufficient evidence to establish the sisters' injuries were caused by a product defect.

Just as Wiegand's liability to Jiminy was triggered regardless of the actual cause of the sisters' injuries, Jiminy's liability to Wiegand was triggered independently of a determination of the exact cause of the sisters' injuries. What matters under the contract is whether the undisputed facts demonstrate that Jiminy defaulted or breached its obligations under the Contract. After reviewing the undisputed facts, the court determines the answer is yes.

Jiminy's obligation to indemnify and defend Wiegand was triggered, by the occurrence of a loss to Wiegand in the form of the settlement with the Catapanos, which arose, directly or indirectly, from actions by Jiminy's breach of one or more of its obligations under the Contract, including its obligation under § 8(i) to "take all necessary preventative measures in order to ensure rider safety." For at least a year prior to the accident, Jiminy had known riders were defeating the shoulder restraint. M.C. herself rode the Coaster with a defeated should harness several times prior to the accident.

Despite having both knowledge of the general problem and multiple opportunities to become aware of the specific violations by M.C., Jiminy took insufficient steps to prevent M.C. from riding with a defeated shoulder restraint at the time of the accident. Jiminy's failure to prevent riders from descending on the Coaster with a defeated shoulder restraint establishes that Jiminy breached its promise to "take all necessary preventative measures . . . to ensure rider safety."

Jiminy concedes it knew (i) riders were defeating the shoulder restraint on the Coaster for at least a year prior to the Catapano sisters' accident, (ii) M.C. was not wearing the shoulder restraint on three rides prior to the ride during which she was partially ejected from the ride, and (iii) she was not wearing the shoulder restraint when the accident occurred. While Jiminy disputes interpretations of the factual record suggesting its staff had actual knowledge that M.C. defeated the shoulder restraint during any of her rides, establishing actual knowledge by Jiminy employees is not required to show Jiminy failed to take "all necessary preventative action." Once Jiminy became aware that riders were defeating the shoulder restraint system, the circumstances required Jiminy to exercise a level of watchfulness sufficient to ensure riders in the rear position were wearing shoulder restraints properly while on the Coaster. Its failure to do so in this case was a breach of its contractual obligations to use preventative measures to protect riders. As a factual matter, Jiminy's failure to ensure M.C. was properly restrained while riding the Coaster gave rise to the Wiegand's losses, in the form of a significant settlement, regardless of whether it was the legal cause of the injuries suffered by the sisters. Under § 12.A.(2) of the Contract, that triggers Jiminy's obligation to indemnify and defend Wiegand.

## VI.   Conclusion

For the foregoing reasons, the parties' cross-motions for summary judgment are hereby ALLOWED to the extent they seek a ruling on the parties' contractual obligations to each other. To

the extent Jiminy sought summary judgment as to its common law claims for indemnification and contribution against Wiegand, its motion is DENIED. The parties are directed to notify the court in writing within thirty (30) days of this ruling whether they wish to pursue their common law claims. Finally, while the court has determined both parties owe each other a duty to defend and indemnify, neither party, at this stage, had reason to raise the issue of the amount each party might owe the other. The parties are, therefore, also directed to notify the court within thirty (30) days of this order how they wish to proceed to establish the amounts owed by each party under its respective duty to defend and indemnify.

It is So Ordered.

_/s/ Mark G. Mastroianni_____

MARK G. MASTROIANNI

United States District Judge